## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LA PLAYITA CICERO, INC.,<br>d/b/a Serenata Restaurant and Bar,<br>& GERARDO MEZA, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 11-cv-1702 |
| v. | ) ) | Judge John Z. Lee |
| TOWN OF CICERO, ILLINOIS,<br>a municipal corporation, LARRY<br>DOMINICK in his official and<br>individual capacities, PAUL<br>DEMBOWSKI, LARRY POLK &<br>SERGE ROCHER, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| LA PLAYITA CICERO, INC.,<br>d/b/a Serenata Restaurant and Bar,<br>& GERARDO MEZA, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 11-cv-5561 |
| v. | ) ) | Judge John Z. Lee |
| TOWN OF CICERO, ILLINOIS,<br>a municipal corporation, | ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Gerardo Meza owned Serenata Restaurant and Bar in the Town of Cicero,

Illinois, from 2005 to 2009. Beginning in 2006, Cicero officials cited, fined, and

summarily closed Serenata numerous times for purported violations of the local liquor code. And in 2008, a Cicero police officer arrested Meza for allegedly striking two Cicero officials who were investigating Serenata.

Meza, who contends that the citations and battery charges were unwarranted, filed these two lawsuits, which have been consolidated for purposes of summary judgment. In one case, No. 11-cv-5561, Meza claims under 28 U.S.C. § 1983 that Cicero violated the Equal Protection Clause of the Fourteenth Amendment and the Free Speech Clause of the First Amendment. In the other case, No. 11-cv-1702, Meza has brought the same claims as well as state law claims against Cicero and four individual defendants. In both cases, Meza contends Defendants targeted him and his restaurant because Meza is Hispanic and because he was politically opposed to the Town President, who was also the Liquor Commissioner. Defendants, who insist that they only sought to protect the public from Serenata's frequent liquor code violations, have filed a consolidated motion for summary judgment.

The Court concludes that numerous disputes of material fact preclude summary judgment on most of Meza's claims. Defendants' consolidated motion for summary judgment is granted on Meza's state law claims as to two defendants, but the motion is otherwise denied.

## I. Factual Background

Defendant Larry Dominick was at all relevant times Cicero's Town President and Liquor Commissioner. Pls.' Add'l Facts ¶ 4. Defendant Paul Dembowski was

the Deputy Liquor Commissioner until he was promoted in June 2009 to Superintendent of Internal Affairs, at which time his wife, Cindy, who is Dominick's sister, took over as Deputy Commissioner. *Id.* ¶¶ 5–6. Defendant Larry Polk was a Cicero police officer who investigated Serenata. *Id.* ¶¶ 8, 14, 27, 49. And Defendant Serge Rocher was the Deputy Superintendent of Auxiliary Police, a position that required him to assist with "protecting the President of the Town" and also involved him in the investigation of Serenata. *Id.* ¶¶ 10, 49.

Dembowski, Polk, and Rocher all supported Dominick politically. *Id.* ¶¶ 7, 9–10. Dembowski and his wife donated tens of thousands of dollars to Dominick's campaigns; Polk donated thousands of dollars as well and attended meetings in support of Dominick's political organization; and Dominick said of Rocher (who Meza describes as Dominick's "bodyguard"), "I know he's on my side [politically]." *Id.*; Pls.' Ex. 10, Dominick Dep. in *Perales v. Cicero*, at 128.[1]

Plaintiff Gerardo Meza, who is Hispanic, opened Serenata in 2005 and began advertising the restaurant in *El Dia*, a local bilingual newspaper owned by the Montes de Oca family. Defs.' Add'l Facts ¶¶ 2, 22. In early 2006, *El Dia* began publishing negative articles about Dominick and his administration. *Id.* ¶ 24. Part of *El Dia*'s criticism of Dominick concerned his purportedly poor treatment of Hispanic members of the community. *Id.*

---

[1] Defendants object to Plaintiffs' characterization of Dembowski and his wife as Dominick's "political allies" on the grounds that the description is "vague" (though they do not similarly object to that characterization of Polk). *See* Defs.' Resp. Pls.' Add'l Facts ¶¶ 7, 9–10. In any event, a jury can decide whether that description is apt.

According to a man named Jose del Angel, who attended "precinct captain" meetings for Dominick's political organization from 2005 to 2007, Dominick was incensed by *El Dia*'s criticism. *Id.* ¶ 25. Del Angel says that he personally heard Dominick call the members of the Montes de Oca family his "political enemies" and announce that anyone who would advertise in *El Dia* was also his political enemy. *Id.* Del Angel says in addition that he heard Dominick at precinct captain meetings referring to Mexican immigrants as "wetbacks," "spics," and "illegal fuckin' immigrants." *Id.* ¶ 65.

Defendants do not dispute that Dominick made the "political enemies" comment, and Dominick admits that he saw Serenata's advertisements in *El Dia* before *El Dia* began to criticize him. Pls.' Add'l Facts ¶ 23.[2] Dominick also admits that he "may have" called both Meza and the owners of *El Dia* "two-legged rats." Pls.' Add'l Facts ¶ 43; Defs.' Resp. Pls.' Add'l Facts ¶ 28. But Dominick denies ever

---

[2] During Dominick's 2010 deposition in this case, he was asked the following questions and gave the following answers:

> Q. You knew that Gerardo Meza was putting advertising in El Dia newspaper for Serenata's?
> A. Sure I did.
> Q. You read El Dia?
> A. Well, I tried not to. Only when there is stuff pertaining to my wife and mother. I would get upset and read it.
> Q. Well, how is it that you would know the Mr. Meza was running advertising in El Dia?
> A. I seen it before. I seen it before. But after they started writing stuff about me – I never read it unless someone said, hey, they said something about your wife or your mother. And then I would read it.

Pls.' Ex. 5, Dominick Dep., at 107.

making derogatory comments about Mexicans. *See* Defs.' Resp. Pls.' Add'l Facts ¶ 65.

In May 2006, Serenata began receiving citations for violations of the local liquor code. Defs.' SOF ¶¶ 13–15. Many of Serenata's citations were the result of "sting" operations conducted by Defendants. *Id.* ¶¶ 6, 10, 31, 33. Dembowski organized the stings of Serenata and other establishments and would inform Dominick anytime an establishment "was busted." Pls.' Add'l Facts ¶¶ 18–19; Pls.' Ex. 5, Dembowski Dep., at 87–88. Dominick himself sometimes prompted stings by forwarding Dembowski liquor license complaints with the expectation that Dembowski would conduct a sting shortly thereafter. *Id.* Additionally, Dominick often personally conducted surveillance outside liquor establishments, including Serenata, "to see if minors were going in." Pls.' Add'l Facts ¶ 16; Pls.' Ex 5, Dominick Dep., at 163–64;[3] Defs.' Resp. Pls.' Add'l Facts ¶ 16.

On July 6, 2006, Dominick and Dembowski ordered Serenata to close for seven days for allegedly serving someone who was underage. Pls.' Add'l Facts ¶ 27. The allegations stemmed from a car accident involving an intoxicated minor who was wearing a colored bracelet similar to those Serenata used to designate patrons who were 21 and over. *Id.* The driver also had an open can of beer in her car. *Id.* Dominick and Dembowski did not interview anyone at Serenata to find out if the underage person had actually been there or if Serenata was using that particular color of bracelet on the evening of the accident. *Id.*

---

[3]     Dominick expressed uncertainty during his deposition about whether he had conducted surveillance at Serenata, but he ultimately seems to concede that he did. Pls.' Ex. 5, Dominick Dep., at 164.

Later in July 2006, Meza encountered Dominick, who, according to Meza, told him to stop advertising in *El Dia*. *Id.* ¶ 28. Meza believed that Dominick was making an implicit threat to target Serenata with additional citations if he did not sever ties with *El Dia* and the Montes de Oca family. *Id.* Dominick denies ever telling Meza not to advertise in *El Dia*. Defs.' Resp. Pls.' Add'l Facts ¶ 28.

The clashes between Meza and the Cicero authorities continued through the rest of 2006. *See* Defs.' SOF ¶¶ 18, 23. On New Year's Eve of that year, Dembowski and Cicero police officers summarily shut down Serenata on the basis that the second floor of the restaurant did not have a valid permit. *Id.* ¶ 18. But the Town Attorney ultimately acknowledged that Serenata had been given permission to operate on the second floor. Pls.' Resp. Defs.' SOF ¶ 18.

In 2007, Serenata was cited for liquor code violations several more times. *See, e.g.*, Defs.' SOF ¶¶ 22, 26. In September of that year Cicero actually revoked Serenata's liquor license, but the revocation was reversed by the Illinois State Liquor Commission in January 2008, and a ten-day suspension was imposed instead. *Id.* ¶¶ 29–30. Serenata continued to receive citations and fines through 2008. *Id.* ¶¶ 31, 33, 35. Some of the penalties were upheld, and some were not. *See, e.g.*, *id.* ¶ 36; Defs.' SOF ¶¶ 29–30.

Also in 2008, Meza attended "Town Board meetings to speak on matters of public concern." Pls.' Add'l Facts ¶ 41. While he was at the podium during a meeting in November, Rocher grabbed him and attempted to pull him away from the

podium. Pls.' Add'l Facts ¶ 39. Then, while Meza was still at the meeting, Serenata received yet another citation. *Id.* ¶ 40.[4]

Defendants continued to clash with Meza in 2009.[5] For example, Meza recalls that at a February 2009 Town Board meeting, Dominick called him his "political enemy" and discouraged him from attending future meetings. Pls.' Add'l Facts ¶¶ 42–43. Dominick concedes that he "may" have done these things. Defs.' Resp. Pls.' Add'l Facts ¶¶ 42–43. And in April 2009, officers searched Serenata, telling Meza that they had received a report that a group of underage girls were drinking there, *id.* ¶ 45,[6] but the officers found no group of girls and no underage drinking, *id.* ¶ 47. Then, at a Town Board meeting in July where Meza criticized Dominick's

---

[4]    Defendants do not directly dispute that these events occurred, but they contend that "Meza has not produced evidence" of Rocher's action and also that Meza cannot testify to what happened at Serenata while he was at the meeting. Defs.' Resp. Pls.' Add'l Facts ¶¶ 39–40. Of course, "a court may consider only admissible evidence in assessing a motion for summary judgment." *Sow v. Fortville Police Dep't*, 636 F.3d 293, 301 (7th Cir. 2011). But Meza's testimony about Rocher *is* evidence, and he may also testify that he learned at some point that his restaurant received a citation during the meeting. Moreover, Dembowski confirmed in an affidavit that he saw Rocher "guide" Meza away from the podium during the November 2008 meeting. *See* Defs.' Ex. P, Dembowski Aff.

[5]    Meza and Cicero reached a settlement agreement about certain citations issued in July 2009. Defs.' SOF ¶ 38. Even without these incidents, however, Meza has presented sufficient evidence to survive summary judgment.

[6]    Defendants also object on hearsay grounds to Meza's testifying about what officers told him was the reason for their visit. Defs.' Resp. Pls.' Add'l Facts ¶ 45. But a statement cannot be hearsay unless it is offered for the truth of the matter asserted, *see* Fed. R. Evid. 801(c)(2). Here, this statement is not being offered for the truth of the matter asserted. Rather, Plaintiffs are implying that the statement was untrue, a mere pretense for searching Serenata.

administration, Dominick's wife, Elizabeth, called Meza a "pig," and officers told him to leave. Pls.' Add'l Facts ¶ 48.[7]

Tensions came to a head on October 3, 2009, when Dembowski,[8] Polk, and Rocher conducted a sting operation at Serenata, sending in two underage women to attempt to purchase alcohol. *Id.* ¶ 49. The women were successful, and the investigators accused Serenata of serving alcohol to minors. *Id.*[9] Meza asked to see the IDs of the underage women. *Id.* ¶ 50. He did this because he suspected that they had used fake IDs to induce the waitress to serve them. *Id.*; Pls.' Ex. 4, Meza Dep., at 96–97. Polk, however, refused to show him their IDs. Pls.' Add'l Facts ¶ 50. An argument ensued outside of Serenata, and Defendants contend that Meza struck Dembowski and Rocher with his fists. Defs.' SOF ¶ 40.

Polk, who admittedly did not witness the alleged battery, Pls.' Ex. 8, Polk Dep., at 123, "made a decision that a battery had occurred" and so arrested Meza, *id.* at 91; *see* Defs.' SOF ¶¶ 60–61. Polk concedes that he did not interview Rocher, Dembowski, or any other witness before making the arrest. Pls.' Ex. 8, Polk Dep., at 91–92, 125–26. Polk does recall, however, that "Mr. Rocher said something to the

---

[7]    Defendants object to Elizabeth Dominick's statement as inadmissible hearsay. *See* Defs.' Resp. Pls.' Add'l Facts ¶ 48. But Plaintiffs obviously are not offering this statement for its truth.

[8]    Dembowski was no longer Deputy Liquor Commissioner at this point—his wife, Dominick's sister, had taken over—but Dembowski still participated in sting operations. Pls.' Add'l Facts ¶ 15.

[9]    Defendants again object on hearsay grounds, *see* Defs.' Resp. Pls.' Add'l Facts ¶ 49, but they have misapprehended the hearsay rules once more. First, the statement is not offered for the truth of the matter asserted. And even if it were, statements made by an opposing party are not hearsay. *See* Fed. R. Evid. 801(d)(2).

effect of [Meza] should be arrested for battery." *Id.* at 91; Defs.' Resp. Pls.' Add'l Facts ¶ 53. Police reports based on later interviews indicate that the underage women, who were working for Dembowski, backed up Dembowski and Rocher's story that Meza had hit the men. Defs.' SOF ¶ 39; Defs.' Ex. GG, Police Reports.[10]

Meza, who denies ever laying a hand on Dembowski or Rocher, was charged with "battery based on bodily harm." Pls.' Add'l Facts ¶¶ 54–55. Additionally, Polk signed a "dram shop report" against Serenata, and Serenata received various other citations relating to the events of that night. *Id.* ¶¶ 57–58; Pls.' Ex. 28, Oct. 2009 Citations. Meza also soon received a notice informing him that Cicero was again seeking to revoke Serenata's liquor license. Pls.' Add'l Facts ¶ 59.

In December 2009, before the revocation proceedings concluded, Meza closed Serenata for good. *Id.* ¶ 63. He contends that Defendants' "incessant harassment and retaliation against" him left him no choice. *Id.*

Meza's criminal case continued into 2010. During a bench trial in September, Rocher testified for the prosecution that Meza had elbowed him in the face. *See* Pls.' Ex. 23, Meza Trial Trans. 1, at 152. The underage women involved with the sting also testified for the prosecution. One of them, Ashley Kennedy, testified that Meza had hit Dembowski on the arm, but she admitted on cross-examination that she had initially told investigators that she saw Meza hit Dembowski in the chest. The

---

[10] Meza objects that the police reports are inadmissible hearsay, Pls.' Resp. Defs.' SOF ¶ 39, and his objection may be valid if the reports are offered for the truth of the matters asserted therein by third parties. *See Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013) (explaining that third-party statements in police reports do not benefit from the "public records" exception to the hearsay rules because "the presumption of reliability does not attach to third parties who themselves have no public duty to report"). This issue can be resolved through a motion in limine prior to trial.

other, Victoria Smith, testified that Meza had hit Dominick, but she was uncertain where, and she admitted that she never saw Meza touch Rocher. *Id.* at 53, 56, 68. A third minor, Liza Irazoque, who was working with Dembowski's crew on liquor sting operations but had not gone into Serenata that night, conceded that, although she saw the incident, she did not actually see Meza's fist make contact with anyone. *Id.* at 76. Polk did not testify at Meza's trial, but he did attend the trial because he "felt [he] had a stake in it." Pls.' Ex. 8, Polk Dep., at 92. The portions of the trial transcript in the record do not reveal whether Dembowski testified.[11]

On September 14, 2010, the judge found Meza guilty of battering Dembowski but not guilty of battering Rocher. Pls.' Ex. 25, Meza Trial Trans. 2, at 203. Meza then moved for a new trial. *See* Pls.' Ex. 31, New Trial Mot.

On October 28, 2010, the judge vacated Meza's conviction for battering Dembowski. Pls.' Ex. 26, Hearing Trans., at 7–11. The judge explained, "I believe you committed a disorderly conduct, and then you committed a battery under the theory of insulting or provoking conduct," but he went on to say that he was wrong to have found Meza guilty of "battery based on bodily harm." *Id.* at 7.

> [I]n my interest in disposing of the case that day, I rushed to judgment and just kind of split the baby and found you not guilty of the one, but guilty of the other . . . . And that's not how a judge really should decide a case. You know you are not part of the criminal element, you are a business person. No one would be afraid to live next to you, these officers, no one would. You are not a danger to

---

[11]     During Dembowski's deposition for this case, which was taken July 20, 2010, he testified that Meza had hit him in October 2009. Pls.' Ex. 6, Dembowski Dep., at 91. But he refused to give any details of the incident, contending that Meza's ongoing criminal case prevented him from doing so. *Id.* 91–94.

the community, and so you deserved a little more consideration than I gave you on that.

*Id.* at 7–8. The judge explained that he had been convinced that Dembowski suffered bodily harm by medical records showing that Dembowski had gone to the hospital after his altercation with Meza, but the judge was bothered by the prosecution's failure to turn over those records so that Meza could try to use them in his defense. *Id.* at 9–10. The bottom line, the judge explained, was that "there was not proof . . . beyond a reasonable doubt for bodily harm." *Id.* at 10.

## II. Procedural History

In case no. 11-cv-5561, Meza names Cicero as defendant and asserts federal claims under the First Amendment and Fourteenth Amendment. In case no. 11-cv-1702, Meza includes the same federal claims but adds state claims and individual defendants. The circuitous path by which these two cases made their way from state to federal court is detailed in the Court's March 11, 2014, opinion in no. 11-cv-1702, *La Playita Cicero, Inc. v. Town of Cicero*, No. 11-cv-1702, 2014 WL 944859, at *1 (N.D. Ill. Mar. 11, 2014), and in an opinion issued by Judge Dow in no. 11-cv-5561 before that case was transferred to this Court, *La Playita Cicero, Inc. v. Town of Cicero*, No. 11-cv-5561, 2013 WL 309089, at *1 (N.D. Ill. Jan. 24, 2013).

As explained, given the atypical procedural history of these cases, the applicable statutes of limitations mean that the federal claims in no. 11-cv-1702 may go forward only to the extent they are based on incidents occurring after February 11, 2009. *La Playita*, No. 11-cv-1702, 2014 WL 944859, at *13. The malicious prosecution claim is timely, and the intentional infliction of emotional

distress claim is timely to the extent it is premised on the malicious prosecution. *Id.* The claims in no. 11-cv-5561, however, can be based on events occurring as early as 2006.

### III. Legal Standard

Defendants have moved for summary judgment on all counts in both cases. Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The Court gives "the non-moving party the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013). In order to survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "must establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor," *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

### IV. Analysis

#### A. Individual Defendants

The Court's analysis will begin with the claims in no. 11-cv-1702 against the individual defendants. As explained, the federal claims in that case must be based on events occurring after February 11, 2009, while the state claims must be tied to Meza's battery prosecution. Additionally, each defendants' potential liability must

be considered independently because an individual cannot be held liable in a § 1983 action unless he or she participated in the alleged constitutional deprivation. *Kuhn v. Goodlow*, 678 F.3d 552, 556 (7th Cir. 2012). And liability may attach to a supervisor only if the alleged constitutional violation occurred at the supervisor's direction or with his knowledge or consent. *Childress v. Walker*, 787 F.3d 433, 440 (7th Cir. 2015). In other words, the doctrine of *respondeat superior* does not apply to actions filed under § 1983. *Flint v. City of Belvidere*, 791 F.3d 764, 766 (7th Cir. 2015).

### 1. First Amendment

Meza claims that Defendants violated the First Amendment by conducting a campaign of harassment against him in retaliation for his political opinion. For Meza's First Amendment retaliation claim to succeed, he must establish the following elements:

> (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the Defendants decision to take the retaliatory action.

*Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). Even "petty" retaliatory acts can violate the First Amendment if together they amount to a campaign of harassment. *DeGuiseppe v. Vill. of Bellwood*, 68 F.3d 187, 192 (7th Cir. 1995); *see also Bridges*, 557 F.3d at 552 (explaining that relatively minor instances of harassment "over a period of several months would deter a person of ordinary firmness from exercising his First Amendment rights.").

Defendants argue that summary judgment should be granted on this claim because, in their view, Meza did not engage in any protected speech before the citations began in 2006, so he cannot show causation. Mem. Supp. at 14. But Meza placed advertisements in *El Dia* before the citations began, and commercial speech is protected by the First Amendment. *See Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653 (2011) ("Under a commercial speech inquiry, it is the State's burden to justify its content-based law as consistent with the First Amendment.") Dominick admits to seeing the Serenata advertisements before *El Di* began criticizing him in early 2006 and before Serenata was first cited in May 2006. Meza then encountered Dominick in July 2006, at which point Dominick (at least according to Meza) told him to stop placing ads in *El Dia*. Meza understood Dominick to mean that Serenata would receive additional citations if he continued to place ads in the newpaper. Meza nonetheless refused, and the citations continued. Although Dominick denies telling Meza to cease his advertising, it will be up to a jury to decide who is telling the truth.

Having rejected Defendants' causation argument, which applied to all defendants, the Court will proceed to an analysis of each Defendant's potential liability for violating Meza's First Amendment rights. For the reason given below, the Court concludes that a reasonable jury could find that each Defendant participated in a campaign designed to silence Meza or to punish him for his political opposition to Dominick. A reasonable jury also could find that the post-February 2009 searches of Serenata, the citations issued, and the battery

accusations Meza endured would have deterred a person of ordinary firmness from exercising his First Amendment rights.

### a. Dominick

Defendants argue that Dominick cannot be liable under § 1983 for violating the First Amendment because, as they see it, there is no evidence that he had any involvement with the post-February 2009 sting operations at Serenata. Mem. Supp. at 6. Dominick, however, was still the Liquor Commissioner and Town President during those times, and if Meza's account of the July 2009 Town Board meeting is credited, Dominick still considered Meza his enemy during this period. A reasonable jury could infer from these facts that Dominick at the very least approved the ongoing operations targeting Meza, and "knowledge and consent" are enough for liability. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) (reversing district court's grant of summary judgment to prison supervisor).

### b. Dembowski

Defendants argue that the battery accusation that Dembowski leveled against Meza cannot be the basis for a First Amendment claim against him because, they contend, probable cause existed for the battery prosecution. Mem. Supp. at 6, 17. They rely on *Hartman v. Moore*, 547 U.S. 250, 252 (2006), in which the Supreme Court held that "want of probable cause must be alleged and proven" for a plaintiff to succeed on a First Amendment claim that investigators induced a prosecution in retaliation for protected speech. The Supreme Court reasoned that

the prosecutor may well have taken the same action even without the investigator's encouragement. *Id.* at 262–64.

*Hartman* is inapplicable to Meza's First Amendment claim. The defendants in that case merely encouraged the prosecution of the plaintiff; they did not fabricate evidence. Here, if Meza's testimony that he never hit Dembowski is taken to be true, then Dembowski (along with Rocher) concocted the battery case against him and also persuaded the underage women in his employ to back up his story. There is no possibility that Meza would have been prosecuted in the absence of Defendants' allegedly false accusations.

What is more, Meza's First Amendment claim against Dembowski does not depend on the fact that Meza was actually prosecuted. Far less consequential false accusations than these can form the basis of a First Amendment retaliation claim if combined with other retaliatory actions. *See, e.g.*, *Pieczynski v. Duffy*, 875 F.2d 1331, 1335–36 (7th Cir. 1989) (concluding that false accusation of unauthorized use of a parking space could be part of a campaign of harassment in violation of the First Amendment). And a reasonable jury could find that Dembowski's accusation of battery was part of a larger campaign of harassment against Meza and Serenata. It's true that most of the alleged campaign occurred before February 11, 2009, but the earlier events, though falling outside the statute of limitations, nevertheless may be relevant to what motivated Defendants' later actions and whether those later actions chilled speech.

### c. Rocher

Defendants contend that Rocher cannot be liable to Meza for violating the First Amendment, making the same argument based on *Hartman* that they made about Dembowski. But *Hartman* is inapplicable for the same reasons it was inapplicable with regard to Dembowski. A reasonable jury could find that Rocher falsely accused Meza of battery as part of a campaign of harassment designed to silence and punish Meza for his political opinion. Meza has offered evidence that Rocher even went so far as to pull him away from the podium at a Town Board meeting. That incident and others, though they fall outside the statute of limitations, may be relevant to the actions Rocher took in October 2009, when he participated in the sting operation and accused Meza of battery.

### d. Polk

Defendants argue that Polk had probable cause to arrest Meza and that he is thus entitled to qualified immunity from his First Amendment claim. In *Reichle v. Howards*, 132 S. Ct. 2088, 2095 (2012), the Supreme Court held that an officer was entitled to qualified immunity because it was not clearly established that a retaliatory arrest would violate the First Amendment if the arrest was supported by probable cause.

Polk, however, may not have had probable cause to arrest Meza. Whether he did depends in part on whether Rocher's statement that Meza should be arrested for battery is understood as Defendants understand it—as a report that Meza had hit him—or is understood as a suggestion that Meza simply should be arrested

regardless of what he may have done. As Polk concedes, he did not interview a single witness before making the arrest, and probable cause for an arrest is about what the officer reasonably believed at the time of the arrest, *United States v. Breit*, 429 F.3d 725, 728 (7th Cir. 2005), so the meaning of Rocher's statement is crucial to the inquiry.

Additionally, Defendants' argument depends on too narrow an understanding of Meza's First Amendment claim. The retaliation Meza alleges against Polk is broader than his arrest. Polk participated in multiple sting operations targeting Serenata over the years, including at least two after February 11, 2009. As a result, even if Meza's arrest were supported by probable cause and Polk were entitled to qualified immunity for the arrest itself, a reasonable jury could find that Polk violated Meza's First Amendment rights by retaliating against him in other ways.

## 2. Equal Protection

Meza claims that Defendants' actions denied him equal protection of the laws. He argues that they discriminated against him on the basis of race and political opinion,[12] and he also presents a "class-of-one" theory, essentially arguing that Defendants, even if they were not motivated by racism or a desire to suppress and punish political dissent, targeted Serenata and Meza without any rational justification.

The government may not selectively enforce a law against someone based on his race or his exercise of a constitutional right without violating the Equal

---

[12] These theories are not in conflict. Meza's political opposition to Dominick, like *El Dia*'s, was connected to Dominick's alleged treatment of Hispanics.

Protection Clause. *Wayte v. United States*, 470 U.S. 598, 608 (1985); *Esmail v. Macrane*, 53 F.3d 176, 179 (7th Cir. 1995). Additionally, the Equal Protection Clause "protect[s] individuals against purely arbitrary government classifications, even when a classification consists of singling out just one person for different treatment for arbitrary and irrational purposes." *Geinosky v. City of Chi.*, 675 F.3d 743, 747 (7th Cir. 2012).

For Meza's equal protection claim to survive summary judgment, he must be able to show that Defendants acted with a "discriminatory purpose" and that their actions had a "discriminatory effect." *Chavez v. Ill. State Police*, 251 F.3d 612, 635–36 (7th Cir. 2001). Evidence of a defendant's overt animus toward plaintiff's class can support the discriminatory purpose aspect of an equal protection claim, *see id.* at 646 (explaining that racist comments are strong evidence of discriminatory intent), and Meza has presented evidence that Dominick may have harbored animosity toward Hispanics, as well as evidence that each Defendant targeted Meza because of his political opposition to Dominick. But to show discriminatory effect, a plaintiff must also provide evidence that a similarly situated person outside of his class was treated more favorably. *Id.* (racist comments "do not by themselves violate the Constitution").

Some of Meza's comparator evidence is inadmissible, [13] but he does identify at least one comparator that would allow a jury to conclude that Dominick, at least,

---

[13]    For example, Meza's asserts in his statement of facts that Cicero turned a blind eye to underage drinking at Al's Restaurant & Pizzeria, but his evidence for this is that people who had been drinking there told him so. Pls.' Add'l Facts ¶ 76. As Defendants correctly point out, this is inadmissible hearsay. Defs.' Resp. Pls' Add'l Facts ¶ 76.

treated Meza differently because of his race, political opinion, or both. The comparator is a white-owned restaurant in Cicero named Papagallos. Pls.' Add'l Facts ¶ 77. Its owner contributed thousands of dollars to Dominick's campaign. *Id.* Meza contends that, although Papagallos received many citations for violations of the liquor code beginning in 2009, it was not fined or suspended for years thereafter. *Id.* Defendants dispute that Papagallos was treated more favorably than Serenata, pointing out that Papagallos was eventually fined and suspended in 2012. Defs.' Resp. Pls.' Add'l Facts ¶ 77. But a reasonable jury could find that Cicero's failure to take meaningful action against Papagallos for years (in fact, not until after this lawsuit was filed) is evidence that Dominick favored Papagallos and disfavored Serenata for discriminatory reasons.

The other individual defendants may not have been involved with Cicero's arguably lenient treatment of Papagallos. Dembowski had stopped being Deputy Liquor Commissioner when his wife took over for him in 2009. But Meza also asserts his equal protection claim under a class-of-one theory, and he need not provide an exact comparison to another individual if it is "readily obvious" that the defendants' actions were motivated by animus. *Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013). A paradigmatic example is found in *Geinosky*, where the defendants had given the plaintiff 24 parking tickets, many of them clearly unwarranted, over a short period of time. 675 F.3d at 745, 749. The Seventh Circuit concluded that identifying a specific individual who was not subjected to such treatment would be unhelpful and that "the pattern and nature of defendants'

alleged conduct do the work of demonstrating the officers' improper discriminatory purpose." *Id.* at 748. Here, if Meza's evidence is credited, each individual defendant unjustly targeted Serenata and Meza, even after February 11, 2009, with sting operations, citations, false accusations, and an unwarranted arrest. And Defendants' pre-2009 treatment of Meza, though outside of the statute of limitations, is admissible as further evidence of their animus. *See id.* at 749 (noting that 10 of the plaintiff's 24 parking tickets fell outside the statute of limitations).

### 3. State Claims

#### a. Count IV – Malicious Prosecution

Defendants contend that Meza cannot prove all of the elements of a malicious prosecution claim. Those elements are:

> (1) the defendant commenced or continued an original criminal or civil judicial proceeding; (2) the proceeding terminated in favor of the plaintiff; (3) there was an absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff.

*Hurlbert v. Charles*, 938 N.E.2d 507, 512 (Ill. 2010).

Defendants argue that the first element is not satisfied as to Dominick. Mem. Supp. at 6. The Court agrees. Dominick was not present when Meza allegedly battered Dembowski and Rocher, and he did not offer any evidence to support the battery charges. Under these circumstances, Dominick cannot be said to have commenced a criminal proceeding against Meza, no matter how much he may have privately approved. Summary judgment is therefore entered in Dominick's favor on this claim.

Next Defendants argue that Meza has not satisfied the second element of a malicious prosecution claim—termination of the proceeding in his favor. Mem. Supp. 8–9. To satisfy this element, the plaintiff must establish that the case ended "in a manner indicative of innocence." *Porter v. City of Chicago*, 912 N.E.2d 1262, 1265 (Ill. App. Ct. 2009). Defendants contend that the judge based his decision to grant a new trial on a discovery violation by the prosecution, implying that Meza got off on a technicality. Mem. Supp. at 9. Defendants also point out that the judge opined Meza had committed disorderly conduct and a less serious form of battery. *Id.*

Meza responds that he was acquitted of the charge relating to Rocher, and he argues that, because he was not charged with disorderly conduct or another form of battery, it is irrelevant that the judge thought he had committed those crimes. Resp. Br. at 9–10. He also argues that Defendants are misconstruing the judge's explanation for vacating his conviction relating to Dembowski. *Id.*

The Court agrees with Meza that the criminal proceedings were terminated in a manner indicative of innocence. The Seventh Circuit has held that "an acquittal is clearly sufficient to show favorable termination" for purposes of malicious prosecution in Illinois. *Logan v. Caterpillar*, Inc., 246 F.3d 912, 926 (7th Cir. 2001). And the judge's decision to vacate Meza's conviction for battering Dembowski was an acknowledgement that Meza should have been acquitted of that charge because the evidence offered at trial was insufficient for conviction. *See* Pls.' Ex. 26, Hearing Trans., at 7–11. The discovery violation primarily mattered because, as Meza

argued in his motion for a new trial, he might have been able to use Dembowski's medical records to undermine his assertions of injury. *Id.*; Pls.' Ex. 31, New Trial Mot., ¶ 5.

Defendants also argue that Meza cannot satisfy the third element of a malicious prosecution claim—the absence of probable cause. Mem. Supp. at 7–8. As they see it, probable cause for the prosecution existed based on the statements of Dembowski, Rocher, and the women working with them on sting operations. *Id.*

But the appropriate question is not whether the prosecutor had probable cause to believe Meza committed battery. When the defendants in a malicious prosecution action are police officers or complaining witnesses rather than prosecutors, the question is whether the defendants themselves had probable cause to believe the offence had been committed at the time they initiated the criminal proceeding. *See Gauger v. Hendle*, 954 N.E.2d 307, 329 (Ill. App. Ct. 2011) ("The existence of probable cause in a malicious-prosecution action is determined by looking to what the defendants knew at the time of subscribing a criminal complaint and not at the (earlier) time of arrest."); *see also Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 626 (7th Cir. 2010) ("The fact that [Principal] Banks had probable cause to sign the criminal complaints for the Stokes' arrest means that defendants are also entitled to summary judgment on these supplemental state-law claims.")

Meza has offered sufficient evidence at the summary judgment stage to satisfy the absence-of-probable cause element as to Dembowski and Rocher. If

Meza's testimony is believed (as it must be at this stage), neither Dembowski nor Rocher ever had probable cause to believe he had committed battery. Meza says he did not touch Dembowski or Rocher, meaning that their statements that he did so must be lies. And Dembowski and Rocher obviously would be well aware under those circumstances that the statements of the underage women were false as well.

Polk, however, is differently situated. Although he may have arrested Meza without probable cause at first, his subsequent interviews of the underage women gave him probable cause for the prosecution. Polk may have known or believed that their accounts were fabrications, but Meza has offered no evidence from which a jury could draw that conclusion. Summary judgment must therefore be entered in Polk's favor on this claim.

Finally, Defendants argue that Meza has not presented evidence that Defendants acted with malice, and so has not satisfied the fourth element of a malicious prosecution claim. Mem. Supp. 9–10. As Meza points out, however, "in the context of malicious prosecution," malice means simply "that the officer who initiated the prosecution had any motive other than that of bringing a guilty party to justice." *Williams v. City of Chi.*, 733 F.3d 749, 759–60 (7th Cir. 2013). If Dembowski and Rocher falsely reported that Meza had hit them, they certainly acted with malice.

### b. Count VI – Intentional Infliction of Emotional Distress

As explained, the Court ruled in an earlier opinion that Meza's intentional infliction of emotional distress (IIED) claim is timely only insofar as it is tied to his

malicious prosecution claim. *La Playita Cicero, Inc. v. Town of Cicero*, No. 11 CV 1702, 2014 WL 944859, at *12 (N.D. Ill. Mar. 11, 2014). The claim is timely to that extent because "IIED claims based on facts alleged in parallel claims for malicious prosecution accrue only when state criminal proceedings are terminated," *Carroccia v. Anderson*, 249 F.Supp.2d 1016, 1028 (N.D. Ill. 2003), and Meza's criminal case did not conclude until the latter half of 2010.

To prove an IIED claim, a plaintiff must demonstrate that: "(1) the defendant's conduct was extreme and outrageous; (2) the emotional distress suffered by the plaintiff was severe; and (3) the defendant knew that severe emotional distress was certain or substantially certain to result from its conduct." *Miller v. Equitable Life Assurance Soc'y of U.S.*, 537 N.E.2d 887, 888 (Ill. App. Ct. 1989). Meza contends that Defendants' conduct and the distress he suffered from his prosecution on false charges satisfies these elements.

Defendants disagree and first argue that their conduct did not rise to the level of "extreme and outrageous." Mem. Supp. at 10. To be extreme and outrageous, conduct "must go beyond all bounds of decency and be considered intolerable in a civilized community." *Fox v. Hayes*, 600 F.3d 819, 842 (7th Cir. 2010). A defendant's conduct is more likely to be extreme and outrageous if the defendant "abused a position of authority." *Id.* Furthermore, "[t]his Court and others have held that a law enforcement officer's fabrication of evidence, or concealment of exculpatory evidence, to criminally inculpate an innocent person is sufficiently extreme and outrageous to give rise to a claim for intentional infliction

of emotional distress." *Manning v. United States*, No. 02-cv-372, 2006 WL 3240112, at \*36 (N.D. Ill. Sept. 28, 2006) (collecting cases).

The Court concludes that, if Dembowski and Rocher falsely accused Meza of battering them, a reasonably jury could find that their conduct rose to the level of extreme and outrageous. They were in a position of authority, and they knew that Meza could be prosecuted and even jailed based on their accusations. *See, e.g.*, *Holder v. Ivanjack*, 39 F.Supp.2d 965, 969–70 (N.D. Ill. 1999) (police officers' false battery accusation could support IIED claim); *Wallace v. City of Zion*, No. 11C2859, 2011 WL 3205495, at \*6 (N.D. Ill. July 28, 2011) (defendant's false report to police that plaintiff had committed a crime could support IIED claim). But there is no evidence that the conduct of Dominick and Polk rose to the level of extreme and outrageous in connection with Meza's prosecution, so summary judgment must be granted on this claim as to them.

Defendants next argue that Meza has provided insufficient evidence of severe emotional distress because a psychologist who evaluated Meza attributed his severe distress to the long campaign against him rather than to the battery charges in particular. Mem. Supp. 10–11. Meza counters that the evaluation does partly attribute his distress—which included suicidal ideation—to the battery charges. Resp. Br. at 12–13. Indeed, the evaluation was conducted while Meza awaited trial on those charges, and the psychologist reported that Meza had given up on Serenata altogether while he was sitting in jail after his arrest. Pls.' Ex. KK (filed under seal), Marshall Report, at 4. In light of this record, a reasonable jury could find that

Meza's emotional distress connected to his criminal prosecution was severe enough to support his IIED claim.

## B. The Town of Cicero

Meza has brought claims against Cicero in both case no. 11-cv-5561 and case no. 11-cv-1702. The only difference between the claims in the two cases is that the claims in no. 11-cv-5561 cover the entire time period beginning in 2006, while those in no. 11-cv-1702 are timely only as to events after February 11, 2009. As a practical matter, only the claims in no. 11-cv-5561 need be considered because they encompass those in the other case, and Meza cannot recover twice for the same injuries.

Under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 694 (1978), "a plaintiff must show that his constitutional injury was caused by (1) the enforcement of an express policy of the [public entity], (2) a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) a person with final policymaking authority." *Wragg v. Vill. of Thornton*, 604 F.3d 464, 467–68 (7th Cir. 2010).

Cicero does not have an explicit policy of discrimination or retaliation, and Meza has offered insufficient evidence of a widespread practice,[14] so his remaining path to establishing municipal liability is to show that his constitutional injury was caused by a final policymaker. Even a single unconstitutional act by a final

---

[14]    Meza identifies numerous Cicero businesses that were (1) Hispanic-owned, (2) did not donate to Dominick's political organization, and (3) were ticketed for liquor violations. Pls.' Add'l Facts ¶¶ 67–75. But without testimony from the owners that these citations were the product of unfair targeting, a reasonable jury could not infer a widespread practice from these facts alone.

policymaker can be enough for *Monell* liability. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986) ("[W]here action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly"); *Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 675 (7th Cir. 2009) ("It is well-established that when a particular course of action is directed by those who set municipal policy, the municipality is responsible under section 1983, even if the action in question is undertaken only once.").

Whether an official is a final policymaker is a question of state law, and courts rather than juries are tasked with making that determination. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) ("As with other questions of state law relevant to the application of federal law, the identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge before the case is submitted to the jury."); *McGee v. Bauer*, 956 F.2d 730, 733 (7th Cir. 1992) ("[W]hether a local official is a policymaker is a question of law to be decided by the trial judge before the case is submitted to a jury."). To identify a final policymaker, courts review "the relevant legal materials, including state and local positive law, as well as 'custom or usage having the force of law.'" *Killinger v. Johnson*, 389 F.3d 765, 771 (7th Cir. 2004) (quoting *Jett*, 491 U.S. at 737). Final policymakers "possess '[r]esponsibility for making law or setting policy,' that is, 'authority to adopt rules for the conduct of government.'" *Rasche v. Vill. of Beecher*, 336 F.3d 588, 599 (7th Cir. 2003) (quoting

*Auriemma v. Rice*, 957 F.2d 397, 401 (7th Cir. 1992). For a policymaker's single unconstitutional act to create liability under *Monell*, the unconstitutional act must have been taken within the realm of the policymaker's actual policymaking authority. *Valentino*, 575 F.3d at 675.

Dominick, as Liquor Commissioner, was a quintessential final policymaker for Cicero. Under state law, a "local liquor control commissioner may revoke or suspend any license issued by him"—including for violations of rules "established by the local liquor control commissioner" himself—and also may "levy a fine for such violations." 235 Ill. Comp. Stat. 5/7-5. A hearing must be held, but following the hearing, the Commissioner is the person who determines whether to impose a penalty. *Id.* As Dominick testified, he made the ultimate decision about whether and how Cicero would punish liquor code violations. *See* Pls.' Ex. 5 (Dominick Dep.) at 63. Although "meaningful review" of an official's decision can undermine their status as a final policymaker, *see Valentino*, 575 F.3d 664, 676 (7th Cir. 2009), and Dominick's decisions to suspend or revoke a liquor license could be overturned by the Illinois Liquor Commission, *see* 235 Ill. Comp. Stat. 5/7-5, the Commission lacks the authority to decide how Cicero officials will investigate licensees or whom they will target. That was up to Dominick, and as Town President as well as Liquor Commissioner, no one was overseeing those decisions. He did delegate some of his authority to Deputy Commissioner Dembowski, but Dominick remained actively involved with liquor code enforcement by, for example, conducting surveillance himself and triggering sting operations by sending complaints to Dembowski. Pls.'

Resp. Defs.' SOF ¶ 4; Pls.' Add'l Facts ¶¶ 16–20. The result is that, if a jury were to find that Dominick, while acting in his capacity as Liquor Commissioner, discriminated against Meza because he is Mexican or retaliated against Meza because of his political opinion, Cicero is liable for those actions under *Monell*.

## III. Conclusion

For the reasons given, Defendants' consolidated motion for summary judgment [ECF 68 (11-cv-5561); ECF 335 (11-cv-1702)] is granted on Meza's state law claims as to Dominick and Polk. The motion is otherwise denied. A status hearing will be held 4/7/16 at 9:15 a.m. to set a date for trial.

**SO ORDERED**                    **ENTER:  3/30/16**

_____
**JOHN Z. LEE**
**United States District Judge**