# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| LA PLAYITA CICERO, INC., d/b/a Serenata Restaurant and Bar, and GERARDO MEZA, ) ) ) ) | |
| Plaintiffs, ) ) | No. 11-cv-1702 |
| v. ) ) | Judge John Z. Lee |
| TOWN OF CICERO, ILLINOIS, a municipal corporation, LARRY DOMINICK in his official and individual capacities, PAUL DEMBOWSKI, LARRY POLK, and SERGE ROCHER, ) ) ) ) ) ) ) | |
| Defendants. ) ) | |

| | |
|---|---|
| LA PLAYITA CICERO, INC., d/b/a Serenata Restaurant and Bar, and GERARDO MEZA, ) ) ) ) | |
| Plaintiffs, ) ) | No. 11-cv-5561 |
| v. ) ) | Judge John Z. Lee |
| TOWN OF CICERO, ILLINOIS, a municipal corporation, ) ) ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

From 2005 to 2009, Gerardo Meza owned La Playita Cicero, Inc., d/b/a Serenata Restaurant and Bar ("Serenata"), a restaurant in Cicero, Illinois, that is now closed. Beginning in 2006, municipal officials from the Town of Cicero cited, fined, and summarily closed Serenata numerous times. Meza and Serenata allege

that these officials targeted them because Meza is Hispanic and was politically unsupportive of Larry Dominick, who was the Town President and Liquor Commissioner. By contrast, the Town of Cicero and its officials claim that the citations and fines were merely the legal consequences of local liquor code violations.

Plaintiffs Meza and Serenata have sued the Town of Cicero under 42 U.S.C. § 1983, alleging violations of the First and Fourteenth Amendments of the federal Constitution (Case No. 11-cv-5561).[1] They have also brought these same constitutional claims against the Town of Cicero in a separate lawsuit in which they further allege several state law claims and add Larry Dominick, Paul Dembowski, Larry Polk, and Serge Rocher as individual defendants (Case No. 11-cv-1702).[2]

In anticipation of trial, Plaintiffs have offered expert witnesses Dr. Gregory Green and Dr. Louise Fitzgerald, and Defendants have offered expert witness Dr. Alan Jaffe. The parties have filed motions *in limine* to bar or strike the opposition's expert testimony.[3] For the reasons set forth below, Defendants' motions to bar

---

[1] Docket entries cited herein correspond to Case No. 11-cv-5561 unless otherwise noted.

[2] For summaries of the labyrinthine procedural history of these two cases, *see La Playita Cicero, Inc. v. Town of Cicero*, No. 11-cv-1702, 2014 WL 944859, at *1 (N.D. Ill. Mar. 11, 2014); *La Playita Cicero, Inc. v. Town of Cicero*, No. 11-cv-5561, 2013 WL 309089, at *1 (N.D. Ill. Jan. 24, 2013).

[3] All of Defendants' motions *in limine* have been filed in Case No. 11-cv-5561, in which only the Town of Cicero is named as a Defendant. The Court's rulings on these motions, however, shall apply equally to the evidence in both Case No. 11-cv-1702 and Case No. 11-cv-5561, in light of the Court's prior ruling—and counsels' agreement—to consolidate the cases for pretrial purposes. *See* Case No. 11-cv-1702, ECF No. 386; Case No. 11-cv-5561, ECF No. 111; *see also* Case No. 11-cv-1702, ECF No. 387; Case No. 11-cv-5561, ECF No. 112 (setting forth identical briefing schedules for the parties' motions *in limine*). As such, to facilitate readers' understanding of the scope of this Memorandum Opinion and Order, the Court will refer to "Defendants" collectively throughout, even though many of the filings referenced herein were filed only in Case No. 11-cv-5561 by the Town of Cicero.

Green [123] [154] are denied. Plaintiffs' cross-filed motions to bar Jaffe in Case No. 11-cv-5561 [133] and Case No. 11-cv-1702 [399] are granted in part and denied in part. Defendants' motion to bar Fitzgerald [131] is also granted in part and denied in part.

## Legal Standard

Although the Federal Rules of Evidence do not explicitly authorize the practice of making *in limine* rulings, "the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). Motions *in limine* allow courts to "ensure the expeditious and evenhanded management of the trial proceedings" by barring evidence that will be clearly inadmissible for any purpose. *Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 440 (7th Cir. 1997). Rulings on motions *in limine* are "subject to change when the case unfolds." *Luce*, 469 U.S. at 41; *see also Farfaras v. Citizens Bank & Trust of Chi.*, 433 F.3d 558, 565 (7th Cir. 2006). Indeed, "even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling." *Luce*, 469 U.S. at 41–42.

The admissibility of expert testimony is governed by Federal Rule of Evidence (FRE) 702 and the Supreme Court's seminal decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005) ("At this point, Rule 702 has superseded *Daubert*, but the standard of review that was established for *Daubert* challenges is still

appropriate."). FRE 702 allows the admission of testimony by an expert—that is, someone with the requisite "knowledge, skill, experience, training, or education"— to help the trier of fact "understand the evidence or [ ] determine a fact in issue." Fed. R. Evid. 702. An expert witness is permitted to testify when (1) the testimony is "based on sufficient facts or data," (2) the testimony is "the product of reliable principles and methods," and (3) the witness has "reliably applied the principles and methods to the facts of the case." *Id.*

Under *Daubert*, the district court must act as the evidentiary gatekeeper, ensuring that FRE 702's requirements of reliability and relevance are satisfied before allowing the finder of fact to hear the testimony of a proffered expert. *See Daubert*, 509 U.S. at 589; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147– 49 (1999). District courts have broad discretion in determining the admissibility of expert testimony. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 810 (7th Cir. 2012). In considering whether to admit expert testimony, district courts employ a three-part framework that inquires whether: (1) the expert is qualified by knowledge, skill, experience, training, or education; (2) the reasoning or methodology underlying the expert's testimony is reliable; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a factual issue. *See Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893–94 (7th Cir. 2011).

With regard to the reliability of an expert's methodology, courts consider factors such as whether the methodology can and has been tested, whether it has

been subject to peer review, whether it has a known or potential rate of error, and whether it is generally accepted among the relevant community. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) (citing *Daubert*, 509 U.S. at 593–94). Under this framework, "shaky expert testimony may be admissible, assailable by its opponents through cross-examination," and criticisms of the testimony's quality speak not to admissibility but to the weight that the testimony should be accorded by the trier of fact. *Metavante Corp. v. Emigrant Savings Bank*, 619 F.3d 748, 762 (7th Cir. 2010) (quoting *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010)).

The proponent of an expert witness bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard by a preponderance of the evidence. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

<u>Analysis</u>

## I.      Defendants' First Motion to Bar Damages Expert Dr. Gregory Green

Plaintiffs have offered economist Dr. Gregory Green to opine on the economic damages sustained by Serenata as a result of Defendants' conduct. In his Initial Report from September 2011, Green offers two principal opinions. First, he opines on Serenata's lost business profits from 2007 until 2009. Green's calculation of these lost profits is based on estimates of Serenata's expected revenues and costs, which in turn are based on Serenata's actual revenues and costs from 2005 to 2009 as well as comparisons to the revenues and costs of Dona Cuca, Inc., a similar restaurant owned by Meza's niece and located approximately 1.5 miles from Serenata. *See* Def.'s Mot. Bar Green, Ex. A ("Green Initial Report"), at 1, 6–8, ECF No. 123. Second, because Serenata ceased operations in December 2009, Green

opines on the lost value of Serenata's business as a going concern from 2010 forward. This opinion is based on Green's use of the Capital Asset Pricing Model, which Green describes as "a method for determining the risk-adjusted discount rate to be used to reduce Serenata's estimated lost profits to their 2011 present value." *Id.* at 1, 10–13.

In response to Green's Initial Report, Defendants obtained rebuttal experts, who criticize Green's Initial Report. *See* Def.'s Mot. Bar Green, Ex. B. Green then prepared a second report, entitled "Rebuttal Report." *See id.*, Ex. C ("Green Rebuttal Report"). Green's Rebuttal Report is dated December 2011.

Defendants' first motion *in limine* seeks to bar Green's Initial Report and Rebuttal Report. Primarily, Defendants challenge Green's use of the Capital Asset Pricing Model. They also argue that Green lacks qualifications to testify as an expert. Lastly, they contend that Green's Rebuttal Report should be barred because it is a sur-rebuttal report that is not permitted under the Federal Rules of Civil Procedure. For the reasons explained below, the Court rejects these arguments and denies Defendants' motion.

### A.    Capital Asset Pricing Model

In challenging Green's use of the Capital Asset Pricing Model (CAPM), Defendants first argue that the model is methodologically unsound. Relatedly, they challenge the factual assumptions underlying Green's application of the CAPM as unreliable. They also argue that Green's discussion of the CAPM reveals that his testimony will not assist the trier of fact as required by FRE 702. The Court finds none of these arguments persuasive.

### 1. Reliability of the Methodology

As explained in Green's Initial Report, the CAPM is an economic model that can be used to estimate a company's going-concern value.[4] The CAPM estimates this value as a function of (1) the rate of return on default-free assets, such as U.S. Treasury securities, (2) the risk measure of the company, (3) the expected risk premium on the overall market portfolio, and (4) the company's size premium. Green Initial Report at 11–13. Courts have long recognized the reliability of the CAPM as a valuation methodology and have routinely permitted expert witnesses to rely upon the CAPM. *See, e.g.*, *Fish v. Greatbanc Trust Co.*, No. 09 C 1668, 2016 WL 5923448, at *28, *35 (N.D. Ill. Sept. 1, 2016) (discussing expert witnesses' use of the CAPM); *In re Bachrach Clothing, Inc.*, 480 B.R. 820, 869 (Bankr. N.D. Ill. 2012) (same); *In re Pullman Constr. Indus. Inc.*, 107 B.R. 909, 921 (Bankr. N.D. Ill. 1989) (same); *see also Buchwald v. Renco Grp.*, 539 B.R. 31, 44 (S.D.N.Y. 2015) ("[I]t is undisputed that the Capital Asset Pricing Model generally, and the use of company-specific risk premium in general, are part of accepted methodologies in corporate valuation."). Tellingly, Defendants cite no case law to the contrary. The Court therefore finds that the CAPM is a sufficiently reliable and well-accepted methodology to form the basis of Green's opinions.

Defendants nevertheless argue that even if the CAPM can reliably estimate the going-concern value of publicly held companies, it is an unreliable method of

---

[4]    "Going-concern value" is "[t]he value of a commercial enterprise's assets or of the enterprise itself as an active business with future earning power." *Black's Law Dictionary* (10th ed. 2014).

valuating privately held companies like Serenata because it is impossible to calculate precise risk measures for such companies. Indeed, Green's Initial Report acknowledges this weakness, explaining that "[b]ecause Serenata is not and never has been a publicly traded entity, no [ ] risk measure can be calculated directly for Serenata." Green Initial Report at 11. To work around this issue, Green estimates Serenata's risk measure by averaging the risk measures of three publicly traded but otherwise comparable restaurant businesses: Chipotle Mexican Grill (whose risk measure is 0.95), Chili's Restaurants (whose risk measure is 1.25), and Texas Roadhouse, Inc. (whose risk measure is 1.00). The average of these businesses' risk measures is 1.07, which Green then rounds to 1.15 in order to make his final estimate more conservative. *Id.* at 11–13.

Contrary to Defendants' assertion, Green's methodology appears to be an accepted means of using the CAPM to estimate a privately held company's going-concern value. *See, e.g.*, *Pullman*, 107 B.R. at 921 (describing use of CAPM by expert witnesses and noting that, because it is impossible to obtain the risk measure of a privately held company, the risk measure must be estimated by way of comparison to publicly traded companies). To the extent Defendants believe that Green's estimate is unsound or contend that the three restaurants used by Green are not comparable to Serenata, they can explore these issues on cross-examination. *Cf. LoggerHead Tools, LLC v. Sears Holdings Corp.*, No. 12-CV-9033, 2016 WL 5112025, at *4 (N.D. Ill. Sept. 20, 2016) ("[T]he fact that [an expert witness] cannot calculate the specific amount of lost profits goes to weight, not admissibility.");

*Davis v. Duran*, 277 F.R.D. 362, 366 (N.D. Ill. 2011) ("Vigorous cross examination, presentation of contrary evidence and careful jury instructions, *Daubert* stressed, are the traditional and appropriate means of attacking shaky but admissible evidence."). Green is therefore permitted to give testimony based on his use of the CAPM.

### 2. Reliability of Underlying Factual Assumptions

Defendants also argue that Green's testimony regarding the CAPM should be barred as unreliable because his opinions are based on unsupported factual assumptions that constitute hearsay. For example, Defendants take issue with Green's assumption that Serenata's earnings would have grown by 30 percent per year until reaching normal operating capacity, as well as his assumption that normal operating capacity would have brought in $1.4 million to $1.5 million in annual revenues. *See* Reply Supp. Mot. Bar Green at 4–5, ECF No. 167 (citing Green Initial Report at 6).

The reliability of such factual assumptions, however, is not to be weighed by the Court *in limine*, but rather is to be "tested by the adversarial process and determined by the jury." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 808 (7th Cir. 2013); *see also Wilbern v. Culver Franchising Sys., Inc.*, No. 13 C 3269, 2015 WL 5722825, at *11–12 (N.D. Ill. Sept. 29, 2015) (denying motion to strike damages expert and noting that "the validity of the expert's factual assumptions is not the focus under a pre-trial *Daubert* inquiry"). And it is well established that an expert witness may base an opinion on otherwise inadmissible facts, including hearsay.

Fed. R. Evid. 703; *Daubert*, 509 U.S. at 595. As such, Defendants' challenges to Green's underlying assumptions are not a basis for barring Green's testimony.

### 3. Assisting the Trier of Fact

In addition, Defendants argue that Green's testimony is unnecessary to assist the trier of fact because his Initial Report demonstrates that damages can be calculated simply by plugging numbers into a formula using the CAPM. This argument is meritless. As explained above, the methodologies that Green employs to estimate Serenata's going-concern value from 2010 forward, as well as to calculate its lost profits from 2007 to 2009, require the use of numerous steps and the input of multiple variables. The Court thus finds that expert testimony explaining the application of these methodologies will clearly assist the jury in determining the issue of damages in this case.

### B. Green's Qualifications

Next, Defendants challenge Green's qualifications to testify as an expert witness. Because Green's expertise focuses on macro-level economic analysis, Defendants argue, he is unqualified to conduct the type of micro-level analysis involved in valuating an individual business such as Serenata. In response, Plaintiffs assert that Green is indeed qualified, pointing out that he has provided consulting services as an economist and taught university courses in macro- and microeconomics since 1997. *See* Pls.' Resp. Mot. Bar Green, Ex. 3, ECF No. 140.

As the Seventh Circuit has warned, "[t]he notion that *Daubert* . . . requires particular credentials for an expert witness is radically unsound." *Tuf Racing Prod., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000). A witness

is qualified to testify as an expert as long as he has "relevant expertise enabling him to offer responsible opinion testimony helpful to the judge or jury." *Id.* (citing Fed. R. Evid. 702). As such, an expert witness is not required to have an academic degree in economics, statistics, or mathematics—much less a specialization in a specific subfield of those areas—to be qualified to opine on the calculation of damages. *See id.* Here, Green has relevant expertise as an economist that enables him to opine on Plaintiffs' economic damages. The Court therefore concludes that Green is qualified to testify regarding the opinions he has offered.

### C.   Whether Green's Report Is an Improper Sur-rebuttal Report

As a procedural matter, Defendants seek to bar Green's Rebuttal Report on the ground that, notwithstanding its title, the report is a sur-rebuttal responding to Defendants' rebuttal to Green's Initial Report. According to Defendants, sur-rebuttal reports are not contemplated by the Federal Rules of Civil Procedure and should therefore be barred. Defendants relatedly argue that allowing Plaintiffs to use a sur-rebuttal report would be prejudicial.

In support of this argument, Defendants fail to cite any case law from this jurisdiction holding that sur-rebuttal reports are procedurally forbidden. In fact, relevant case law suggests that sur-rebuttal reports are permissible, as long as they remain within the scope of proper rebuttal testimony, as is the case here. *See Ernst v. City of Chi.*, No. 08 C 4370, 2013 WL 4804837, at *1 (N.D. Ill. Sept. 9, 2013) (permitting use of sur-rebuttal expert report); *City of Gary v. Shafer*, No. 2:07-CV-56-PRC, 2009 WL 1370997, at *6 (N.D. Ind. May 13, 2009) (same); *cf. Shen Wei (USA) Inc. v. Sempermed USA, Inc.*, No. 05 C 6004, 2009 WL 674364, at *2 (N.D. Ill.

Mar. 12, 2009) (striking sur-rebuttal report only because it exceeded the scope of proper sur-rebuttal testimony, not because sur-rebuttal reports are categorically barred as a matter of procedure). And although the Federal Rules of Civil Procedure do not make explicit reference to sur-rebuttal reports, neither do they appear to forbid them. *See, e.g.*, Fed. R. Civ. P. 26(a)(2)(D)(ii) (addressing rebuttal expert testimony in general and imposing no prohibition on evidence that in turn rebuts an opposing party's rebuttal evidence).

Furthermore, Defendants fail to explain why they would be unfairly prejudiced by the admission of Green's sur-rebuttal report. Indeed, such prejudice seems unlikely, given that Defendants have had the report since 2011 and thus cannot suddenly now claim that the report comes as a surprise. *See* Pls.' Resp. Mot. Bar Green at 1. As such, the Court sees no basis for barring Green's Rebuttal Report on grounds of unfair prejudice.

In sum, none of Defendants' arguments in support of their first motion to bar Green provides a sufficient basis to bar Green's testimony. The motion is therefore denied.

## II.   Defendants' Second Motion to Bar Damages Expert Dr. Gregory Green

In July 2016, Green supplemented his Initial Report with a two-page document that converts the economic damages estimated in his Initial Report from 2011 dollar values to 2016 dollar values. Def.'s Mot. Strike Supp. Report, Ex. A, ECF No. 154. Additionally, in their brief responding to Defendants' first motion to bar Green, Plaintiffs attached a two-page declaration in which Green briefly

addressed some of the criticisms that Defendants had leveled at his use of the CAPM. Pls.' Resp. Mot. Bar Green, Ex. 1 ("Green Decl.").

Defendants' second motion to bar Green objects to his July 2016 two-page supplement and the two-page declaration attached to Plaintiffs' response brief. Defendants seek to bar these documents on the grounds that (1) the supplement was tendered to Defendants long after the close of discovery and (2) the supplement and declaration improperly include new expert opinions. In the event that the Court declines to bar these documents, Defendants alternatively seek permission to re-depose Green and to file a reply brief fourteen days after Green's second deposition or the Court's adjudication of this motion.[5]

As an initial matter, Plaintiffs maintain that Green's two-page supplement was appropriately and timely tendered to Defendants under Federal Rule of Civil Procedure (FRCP) 26. The Court agrees. Under FRCP 26, an expert report must be supplemented with any additional or corrective information at least thirty days before trial. Fed. R. Civ. P. 26(e)(2) (incorporating by reference the thirty-day pretrial deadline set forth under FRCP 26(a)(3)). Green's supplement, which provided additional or corrective information by converting the figures in Green's

---

[5] In addition, Defendants' brief in support of this motion attempts to supplement Defendants' first motion to bar Green by raising a new challenge to the assumptions underlying Green's Initial Report. Specifically, Defendants challenge the Initial Report's use of comparisons to the revenues and costs of the restaurant Dona Cuca, Inc. *See* Def.'s Mot. Strike Supp. Report at 6–7. Because this argument was inappropriately raised in a brief on a separate and unrelated motion, the Court is not obligated to address it. In any event, the argument is unpersuasive for the same reasons discussed above regarding Defendants' other challenges to Green's underlying assumptions.

Initial Report from 2011 dollar values to 2016 dollar values, was timely provided to Defendants under this rule. *See* Def.'s Mot. Strike Supp. Report, Ex. A.

Furthermore, because Green's supplement merely performed a mechanical conversion of dollar values to account for the changing time value of money, the Court finds that the supplement did not improperly include new expert opinions. Neither did Green's two-page declaration, which merely restated key points of information that had already been incorporated in Green's Initial Report. *See* Green Decl. ¶¶ 3–7. The Court thus denies Defendants' motion to strike the supplement and declaration.

The Court is unpersuaded that the admission of Green's supplement and declaration warrants a second deposition of Green, given these documents' nature and limited scope. Defendants' request for leave to re-depose Green is therefore also denied. To the extent Defendants' motion requests an extension of time to file a reply brief, the motion is denied as moot.

## III.   Plaintiffs' Motion to Bar Psychologist Dr. Alan Jaffe

Plaintiffs and Defendants have offered competing experts to opine on the extent of the emotional pain and suffering Meza has experienced as a result of Defendants' conduct. First, Plaintiffs offer a report by psychologist Dr. Robert Marshall. In 2010 and 2011, Marshall conducted psychological evaluations of Meza that included administration of a test called the Minnesota Multiphasic Personality Inventory, Second Edition ("MMPI-2"). *See* Def.'s Resp. Mot. Bar Jaffe, Ex. D ("Marshall Report"), ECF No. 143. In turn, Defendants offer psychologist Dr. Alan Jaffe as a rebuttal witness. In conducting his own evaluation of Meza, Jaffe

administered the Personality Assessment Inventory and two sets of Sentence Completion tests. He also re-administered the MMPI-2 test that Marshall used. *See* Pls.' Mot. Bar Jaffe, Ex. A ("Jaffe Report"), at 2, ECF No. 133.

Plaintiffs have moved to bar Jaffe on multiple grounds. First, they attack the reliability of Jaffe's methodology, challenging aspects of the MMPI-2 and Sentence Completion tests and further challenging Jaffe's failure to use alternative evaluative methods. Second, Plaintiffs contend that Jaffe's conclusions will not assist the jury because they are speculative, inflammatory, and unsupported. The Court will address these arguments below.[6]

## A. Jaffe's Methodology

### 1. MMPI-2 Test and the "Faking Bad Scale"

MMPI testing is a widely accepted form of psychological evaluation that is used to "assess multiple dimensions of personality and mental state." Federal Judicial Center, *Reference Manual on Scientific Evidence* 836, 886 (3d ed. 2011). In particular, the MMPI-2 test comprises a number of "scales," and an individual's scores along these scales may correlate with various personality traits or mental states. Included among these scales is the "faking bad scale," or "FBS." An individual's score on the FBS may indicate whether the individual is "faking bad"

---

[6] Plaintiffs' motion to bar Jaffe also attempts to incorporate by reference the report of another one of Plaintiffs' experts, Dr. Louise Fitzgerald, "as though fully set forth herein as additional reasons Jaffe's opinions should be bar[red]." Pls.' Mot. Bar Jaffe at 2 n.1. Parties are not permitted to circumvent the page limits imposed by Local Rule 7.1 by incorporating other documents by reference in this manner, and the Court is in any event not obligated to construct legal arguments not presented in the parties' briefs. *See Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010). The Court therefore declines to consider or construct any additional arguments from Fitzgerald's report in ruling on Plaintiffs' motion to bar Jaffe.

(*i.e.*, malingering by fabricating or exaggerating his symptoms) or "faking good" (*i.e.*, hiding or understating his symptoms). *See id.* at 836, 841.

In objecting to Jaffe's use of the MMPI-2 test, Plaintiffs focus on the FBS, arguing that the FBS is an unreliable and controversial component of the MMPI-2 test and that Jaffe should therefore be barred from testifying about the FBS test results. The Court disagrees. While the FBS is "not without controversy," "the bulk of the psychological literature appears to support [its] validity." *Id.* at 841 n.150 (citing Nathaniel W. Nelson, et al., *Meta-analysis of the MMPI-2 Fake Bad Scale: Utility in Forensic Practice*, 20 Clin. Neuropsych. 39 (2006)). Moreover, numerous federal courts have recognized the reliability of the FBS and have admitted expert testimony regarding FBS testing. *See Johnson v. BAE Sys. Land & Armaments, L.P.*, No. 3:12-CV-1790-D, 2014 WL 1714487, at *34 (N.D. Tex. Apr. 30, 2014) (denying motion *in limine* to exclude testimony regarding the FBS on grounds of unreliability); *Johnson v. Rockwell Automation, Inc.*, No. 1:06CV00017JLH, 2009 WL 1748344, at *4 (E.D. Ark. June 17, 2009) (same); *Shea v. Long Island R.R. Co.*, No. 05 CIV 9768 (LLS), 2009 WL 1424115, at *3 (S.D.N.Y. May 21, 2009) (same); *Reiner v. Warren Resort Hotels, Inc.*, No. CV 06-173-M-DWM, 2008 WL 5120682, at *15 (D. Mont. Oct. 1, 2008) ("The Court will deny the motion to exclude the evidence of FBS testing. The test is recognized as valid within the neuropsychology profession. While the test is controversial, Plaintiff can argue the weight of the evidence to the jury."); *see also Kendrick v. Shalala*, 998 F.2d 455, 457–58 (7th Cir.

1993) (discussing testimony from an administrative hearing regarding FBS testing).

The Court accordingly declines to bar Jaffe from testifying about the FBS.

### 2. Sentence Completion Tests

Next, Plaintiffs challenge the Sentence Completion tests that Jaffe administered in evaluating Meza. Jaffe's report discusses the Sentence Completion test in only two paragraphs, which read in their entirety as follows:

> Mr. Meza was administered the Sentence Completion – Adult Form on November 2, 2011. Mr. Meza's responses held one major theme throughout the majority of the form. The majority of his responses were in regards to justice and his current litigation. This type of preservation throughout her [sic] answers indicates that he had a clear agenda with an obsessional quality. Additionally, some of his answers were concrete in nature without any level of abstraction. For example, for the sentence stem "Spiritual matters," he responded "God first."
>
> Mr. Meza was administered the Sentence Completion – Work Form on November 2, 2011. As with the Sentence Completion – Adult Form, the majority of Meza's responses on the Sentence Completion – Work Form were in regards to his current litigation. Furthermore, his responses on the Work form appear to lack a level of abstraction. For example, for the sentence stem "Socializing with co-workers," he responded, "Never do."

Jaffe Report at 17–18. Plaintiffs argue that testimony about the Sentence Completion tests should be barred because the tests are unreliable and because it is unclear what Jaffe concludes from Meza's response to the test questions.

In their response brief, Defendants have made no attempt to defend Jaffe's use of the Sentence Completion tests. Where a party fails to advance arguments in support of expert testimony, the party cannot bear its burden of proving the testimony's admissibility. *Lewis*, 561 F.3d at 706. Here, Defendants have provided the Court with no information about the Sentence Completion tests, such as the

method employed in conducting the tests or the content and number of questions that the tests comprised. Without such information, the Court has no means of assessing whether the Sentence Completion tests were based on reliable principles or methodologies as required by FRE 702. By failing to defend or explain Jaffe's use of the Sentence Completion tests, Defendants have not carried their burden of proving the admissibility of testimony regarding these tests. *See id.* Jaffe is thus barred from offering such testimony.

### 3. Failure to Use Alternative Methods

Finally, Plaintiffs argue that Jaffe's testimony should be barred as unreliable because Jaffe failed to use various alternative methods of evaluating Meza. Specifically, Plaintiffs criticize Jaffe because he did not conduct a SIRS-2 test, a Structured Clinical Interview for DSM-IV, or an interview assessment for depression or psychological harm. In response, Defendants argue that Jaffe did in fact use a Structured Clinical Interview and also conducted an interview assessment for depression. *See* Def.'s Resp. Mot. Bar Jaffe at 4–6.

Even assuming *arguendo* that Jaffe did not use these alternative methods, as Plaintiffs allege, Jaffe's decision not to use those methods does nothing to undermine the reliability of the methods he did rely upon. The rule that an expert's testimony must be "the product of reliable principles and methods," Fed. R. Evid. 702, does not amount to a requirement that the expert use all methods or even the best methods available. Recognizing as much, the Seventh Circuit has cautioned district courts against choosing between competing methods when determining whether to admit expert testimony. *See Schultz v. Akzo Nobel Paints, LLC*, 721

F.3d 426, 433 (7th Cir. 2013). Jaffe's failure to use the alternative methods that Plaintiffs list is therefore not a basis for excluding his testimony. To the extent that the results of alternative evaluative methods would have cast doubt upon Jaffe's conclusions, Plaintiffs are free to raise this issue on cross-examination, and it will be "the role of the jury to weigh these sources of doubt." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013).

### B.    Jaffe's Conclusions

#### 1.    Interpretation of the MMPI-2 Test Results

In addition to challenging the reliability of Jaffe's methodology, Plaintiffs challenge the reliability of Jaffe's conclusions. First, Plaintiffs argue that Jaffe's interpretations of the MMPI-2 test results are too speculative. By way of example, Plaintiffs point to statements in Jaffe's report such as: "Meza's profile indicates that he may have some concerns regarding somatic functioning," and "Meza's score indicates that he may be experiencing a moderate degree of stress as a result of difficulties in some major area of life." Pls.' Mot. Bar Jaffe at 10–11 (quoting Jaffe Report). According to Plaintiffs, such interpretations of Meza's test results are purely speculative because Jaffe has not explained how likely it is that these interpretations accurately describe Meza. Second, Plaintiffs take issue with a portion of Jaffe's report in which Jaffe expresses disagreement with Marshall's interpretation of Meza's score on the "L scale" of the MMPI-2 test.

These arguments are unpersuasive. "Rule 702's requirement that the district judge determine that the expert used reliable methods does not ordinarily extend to the reliability of the conclusions those methods produce." *Manpower*, 732 F.3d at

806 (quoting *Stollings*, 725 F.3d at 765). A district court accordingly "usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's . . . conclusions rather than the reliability of the methodology the expert employed." *Id.* The Seventh Circuit has also held that an expert is not required to interpret test results to a degree of scientific certainty in order for his testimony to be admissible. *See Stutzman v. CRST, Inc.*, 997 F.2d 291, 296 (7th Cir. 1993).

In light of these principles, Jaffe is permitted to testify about his interpretations of what Meza's scores may indicate about Meza's psychological and emotional health. To the extent the accuracy of these interpretations may be uncertain, Plaintiffs can take the opportunity at trial to test "the accuracy of the actual evidence . . . with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Lapsley*, 689 F.3d at 805 (quoting *Daubert*, 509 U.S. at 596).

### 2. Conclusions in the Summary of Jaffe's Report

Lastly, Plaintiffs seek to bar certain statements made in the summary at the end of Jaffe's report. They contend that these statements will not assist the jury as required by FRE 702 because they are inflammatory and unsupported.

In his summary, Jaffe opines in part: "[I]t is clear from the discrepancy in the test result data given by Dr. Marshall and this examiner that Mr. Meza is attempting to fake bad on the assessments. This . . . severely calls into question the accuracy of [Meza's] reporting. This is someone who is obviously trying to manipulate the interpretation of these results." Jaffe Report at 18. In these

statements, Jaffe is opining on the credibility or accuracy of Meza's answers to questions that Marshall and Jaffe asked him during their psychological evaluations. Because these statements are based on the results of MMPI-2 and FBS testing, the Court finds that they are sufficiently supported to assist the jury in determining the issue of damages with regard to Meza's emotional pain and suffering.

But other statements in Jaffe's summary fare differently. For example, Jaffe states that Meza has made "outlandish claims" and "on several occasions has blatantly misrepresented the truth." *Id.* Jaffe further states that he "questions the validity of Mr. Meza's character as an individual." *Id.* Having closely reviewed Jaffe's report, the Court agrees with Plaintiffs that these overbroad statements about Meza's general credibility and character are not supported by the evaluations Jaffe conducted. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec.*, 522 U.S. at 146. Because these generalized criticisms of Meza's credibility and character constitute such *ipse dixit* assertions, the Court finds that they are inadmissible under FRE 702.

In addition, Jaffe's statements about Meza's general credibility—as opposed to his statements about the credibility of the answers that Meza gave specifically in the context of Marshall's and Jaffe's psychological evaluations—will not help the trier of fact "to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Instead, such statements are more likely to confuse the trier of fact. The jury might misunderstand Jaffe to be opining not merely on Meza's credibility

21

in answering questions during the psychological evaluations, but rather on Meza's credibility in giving testimony during the trial itself. This is another reason why Jaffe's statements about Meza's general credibility are inadmissible under FRE 702.

In sum, as a means of criticizing Marshall's conclusions, Jaffe is permitted to testify about the credibility of Meza's responses to questions that he was asked during Marshall's and Jaffe's psychological evaluations. Similarly, Jaffe may opine as to Meza's psychological and emotional health, to the extent his opinions are based on the results of the psychological evaluations, again as a means of rebutting Marshall's conclusions. But Jaffe is not permitted to testify more generally about Meza's credibility outside the context of the psychological evaluations. Nor is Jaffe permitted to make overbroad statements about Meza's character untethered from the results of those evaluations, such as his statement in the summary of his report that Meza's purported misrepresentations generally call into question "the validity of Mr. Meza's character as an individual." Such overbroad, unsupported statements about Meza's credibility and character shall be barred.

## IV. Defendants' Motion to Bar Psychologist Dr. Louise Fitzgerald

To contradict the conclusions set forth in Jaffe's expert report, Plaintiffs have offered psychologist Dr. Louise Fitzgerald as a rebuttal expert. *See* Def.'s Mot. Bar Fitzgerald, Ex. C ("Fitzgerald Report"), ECF No. 131. Defendants have moved to bar Fitzgerald on the grounds that: (1) Plaintiffs failed to timely disclose Fitzgerald's report; (2) Fitzgerald's report is an improper sur-rebuttal report that is not contemplated by the Federal Rules of Civil Procedure; and (3) Fitzgerald's report will not assist the jury because it is confusing, irrelevant, and duplicative.

### A.    Timeliness of Plaintiffs' Disclosure

Plaintiffs disclosed Fitzgerald's report to Defendants on December 26, 2012. Defendants argue that Fitzgerald should be barred because this disclosure was untimely under FRCP 26(a)(2)(D)(ii).  For the reasons explained below, the Court disagrees.

FRCP 26(a)(2) requires parties to disclose the written reports of their expert witnesses.  An expert's written report must contain a complete statement of the opinions the witness will express, the facts or data considered by the witness in forming those opinions, any exhibits the witness will use, the witness's qualifications, a list of other cases in which the witness has testified as an expert, and a statement of the compensation to be paid for the witness's study and testimony.  Fed. R. Civ. P. 26(a)(2)(B).  Absent a stipulation or court order, a party must disclose the report of a rebuttal expert witness no later than thirty days after the opposing party discloses the report of the expert witness whose testimony is to be rebutted.  Fed. R. Civ. P. 26(a)(2)(D)(ii).

Defendants disclosed Jaffe's expert report on December 19, 2011.  They therefore argue that Plaintiffs were required to disclose Fitzgerald's report no later than January 19, 2012, thirty days after Defendants' disclosure.  There are two reasons, however, why Plaintiffs were not required to disclose Fitzgerald's report by that date.

First, Plaintiffs' thirty-day disclosure period did not begin to run when Defendants tendered Jaffe's report on December 19, 2011, because Jaffe's report did not disclose all of the information required under FRCP 26(a)(2)(B) at that time.

Indeed, after failed attempts to obtain Defendants' cooperation in this regard, Plaintiffs filed a motion seeking in part to compel the completion of Defendants' disclosures under FRCP 26(a)(2)(B)(ii). *See* Mot. Compel at 2–3, No. 11-cv-1702, ECF No. 241. The Court granted this motion during a hearing on December 12, 2012, ordering Defendants to complete their expert disclosures by December 19, 2012. Defendants complied, and Plaintiffs then disclosed Fitzgerald's report on December 26, 2012—well within thirty days after December 19, 2012.

Second, even if Jaffe's report had fully complied with all disclosure requirements from the outset, the record suggests that Plaintiffs were not bound to the default thirty-day deadline because Defendants agreed to give Plaintiffs an extension of time to disclose Fitzgerald's report. *See* Fed. R. Civ. P. 26(a)(2)(D) (allowing parties to stipulate deadlines for expert disclosures). Defendants now deny ever having made such an agreement. Def.'s Reply Supp. Mot. Bar Fitzgerald at 4, ECF No. 156 ("[D]efense counsel has no recollection of agreeing to give [Plaintiffs] additional time to disclose a rebuttal report."). Yet Plaintiffs' filings and representations to the Court repeatedly suggest that the parties had reached such an understanding, and Defendants have never before objected to these representations. *See* Hr'g Tr. 12/12/12 at 10, Case No. 11-cv-1702, ECF No. 416; Pls.' Mot. Compel at 2, Case No. 11-cv-1702, ECF No. 241; Hr'g Tr. 1/25/12 at 4, Case No. 11-cv-1702, ECF No. 218; Pls.' Mot. Bar Jaffe or Show Cause at 1, Case No. 11-cv-1702, ECF No. 215. Given that these representations were made as late as December 12, 2012, the Court finds that Defendants either agreed to Plaintiffs'

request for additional time or, at the very least, did not object to it. For these reasons, the Court declines to bar Fitzgerald's report on grounds of untimeliness.

**B.     Whether Fitzgerald's Report Is an Improper Sur-rebuttal Report**

Defendants also argue that Fitzgerald's report is a sur-rebuttal report to Jaffe's report (which in turn is a rebuttal to Marshall's report) and that such sur-rebuttal reports are not permitted under the Federal Rules of Civil Procedure. The Court rejects this argument for the same reasons it rejected this argument *supra* in connection with Defendants' motion to bar Green. Case law shows that sur-rebuttal expert reports are permissible, *see, e.g.*, *Ernst*, 2013 WL 4804837, at *1; *Shafer*, 2009 WL 1370997, at *6, and Defendants fail to cite authorities from within the Seventh Circuit suggesting otherwise. Nor have Defendants articulated any undue prejudice that they would suffer if Fitzgerald's report were permitted. The Court therefore declines to bar Fitzgerald on this basis.

**C.     Assisting the Trier of Fact**

Finally, Defendants contend that Fitzgerald's report should be barred because it is too confusing, irrelevant, and duplicative to assist the trier of fact as required by FRE 702. According to Defendants, the report is confusing and irrelevant because it focuses exclusively on rebutting Jaffe's report, and it is duplicative because it merely restates information already included in Marshall's report. Defendants also take issue with portions of Fitzgerald's report in which she opines as to the reliability of Jaffe's methodology and the admissibility of expert testimony based on the FBS.

As an initial matter, the fact that Fitzgerald's report is devoted to contradicting Jaffe's report is grounds for admitting it as proper rebuttal evidence,

not grounds for excluding it as confusing or irrelevant. Such rebuttal evidence is routinely admitted under the Federal Rules of Evidence. *See Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 630 (7th Cir. 2008). The Court also disagrees that Fitzgerald's report is duplicative of Marshall's report. Even though both reports speak to the issue of Meza's damages for emotional pain and suffering, Marshall's report was prepared before Jaffe's report was made available to Plaintiffs, and Marshall's report therefore could not have included the rebuttal evidence that is offered in Fitzgerald's report.

That said, some portions of Fitzgerald's report are indeed rendered irrelevant by this Court's decision, discussed *supra*, to bar certain portions of Jaffe's report. Specifically, because Jaffe is barred from giving testimony about the Sentence Completion tests and from making generalized statements about Meza's credibility and character outside the context of Marshall's and Jaffe's psychological evaluations, Fitzgerald's rebuttal testimony with regard to these matters is no longer relevant and will not assist the trier of fact. Fitzgerald is therefore barred from testifying about them.

Moreover, Fitzgerald is barred from opining on the admissibility of Jaffe's testimony, as well as from opining that Jaffe's methodology is unreliable for purposes of the *Daubert* standard. Expert witnesses are generally prohibited from offering legal opinion testimony. *See, e.g.*, *United States v. Sinclair*, 74 F.3d 753, 757 n.1 (7th Cir. 1996) (collecting cases); *Sullivan v. Alcatel-Lucent USA Inc.*, No. 12 C 07528, 2014 WL 3558690, at *8–9 (N.D. Ill. July 17, 2014). In addition, even if

such legal opinion testimony were permissible as a general matter, Fitzgerald is unqualified to give such testimony because she is not, and does not purport to be, a legal expert. *See Willis v. Sears Holdings Mgmt. Corp.*, No. 10 C 5926, 2012 WL 3915333, at *7–9 (N.D. Ill. Sept. 7, 2012) (barring legal opinion testimony in part because expert was not a lawyer and was thus unqualified to give the legal opinions he offered). As such, Fitzgerald may not opine on the admissibility of Jaffe's testimony or on the reliability of his methodology for *Daubert* purposes.[7] She may, however, testify as to the reliability of the *conclusions* that Jaffe draws, including his interpretations of the test results from his and Marshall's psychological evaluations of Meza. Furthermore, in the course of critiquing the reliability of Jaffe's conclusions, Fitzgerald may also discuss weaknesses in Jaffe's underlying methodology, because such weaknesses speak to the weight that the trier of fact should ultimately give to Jaffe's conclusions. Again, however, she may not opine that Jaffe's methodology is wholly unreliable or otherwise suggest that Jaffe's testimony is inadmissible under *Daubert*.

In sum, Fitzgerald is barred from testifying on matters that are rendered irrelevant by the Court's rulings on Plaintiffs' motion to bar Jaffe. She is also barred from giving legal opinions regarding the admissibility of Jaffe's testimony or

---

[7]     For example, in her report, Fitzgerald writes: "Considering the current controversy within the scientific community, it is prudent at this point not to rely on [the FBS] scale. . . . In addition, controversy exists in the courts considering whether testimony of expert witnesses is admissible if based on the FBS." Fitzgerald Report at 6. Such testimony states a legal opinion and speaks to the reliability of Jaffe's methodology under *Daubert*. It is therefore inadmissible.

regarding the reliability of Jaffe's methodology under the *Daubert* standard.  In all other respects, Defendants' motion to bar Fitzgerald is denied.

## Conclusion

For the reasons stated herein, the motions to bar Green in Case No. 11-cv-5561 [123] [154] are denied.  The cross-filed motions to bar Jaffe in Case No. 11-cv-5561 [133] and Case No. 11-cv-1702 [399] are granted in part and denied in part.  Jaffe is permitted to testify about the reliability of Marshall's conclusions, to the extent they are affected by the truthfulness of Meza's responses to questions asked during Marshall's and Jaffe's psychological evaluations.  Jaffe may also opine as to Meza's psychological and emotional health, to the extent his opinions are based on the results of psychological evaluations, again for the purposes of rebutting Marshall's conclusions.  But Jaffe is barred from opining as to Meza's credibility outside the context of his answers to questions asked during Marshall's and Jaffe's psychological evaluations.  He is also barred from making overbroad statements about Meza's character in general, because such statements are not based on the results of the psychological evaluations.  In all other respects, the motions to bar Jaffe are denied.  The motion to bar Fitzgerald in Case No. 11-cv-5561 [131] is also granted in part and denied in part.  Fitzgerald is barred from testifying about Jaffe's Sentence Completion tests or about Jaffe's opinions regarding Meza's credibility or character in general, in light of the fact that Jaffe's opinions on these matters are barred.  She is also barred from testifying about the admissibility of

Jaffe's testimony or the reliability of Jaffe's methodology for purposes of *Daubert*.

In all other respects, the motion to bar Fitzgerald is denied.

**IT IS SO ORDERED.**          **ENTERED**     3/28/17

_____
**John Z. Lee**
**United States District Judge**